IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MARKETDIAL, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>v.<br><br>APPLIED PREDICTIVE TECHNOLOGIES, INC., a Delaware corporation,<br><br>        Defendant. | **MEMORANDUM DECISION & ORDER ON THE PARTIES' MOTIONS TO DISMISS**<br><br>Case No. 1:23-cv-00477-JNP-CMR<br><br>District Judge Jill N. Parrish |

Through this action, MarketDial, Inc. ("MarketDial") seeks a declaration that U.S. Patent No. RE49,562 ("'562 patent") is invalid or unenforceable. In response, the owner of the '562 patent, Applied Predictive Technologies, Inc. ("APT"), answers and asserts a counterclaim against MarketDial for infringement of the '562 patent in violation of 35 U.S.C. § 271 *et seq*. Before the court are the parties' motions to dismiss the complaint and counterclaim, respectively. For the reasons set out below, MarketDial's motion to dismiss APT's counterclaim is **GRANTED**, and APT's motion to dismiss the complaint is **DENIED AS MOOT**.

## FACTUAL BACKGROUND

### A.  Previous patent

This case turns on the validity of the '562 patent. The '562 patent is a reissue of U.S. Patent No. 8,571,916 ("'916 patent"), which issued in 2006. The '916 patent "relate[d] to business initiative analysis systems, and more particularly, to methods, systems, and articles of manufacture for performing a segmented initiative analysis for initiatives implemented at selected business

locations in order to identify in which other locations to implement the initiative." '916 patent at 1:18-23. As a previous order of this court explained, the '916 patent was directed to a problem that can be characterized in the following terms:

> While retailers have traditionally relied upon their business instincts or anecdotal evidence to determine whether an initiative is worth launching, some have more recently sought to adopt a more structured and analytical approach. Rather than relying solely on intuition, retailers may test a business initiative by implementing it at one or more locations, collecting performance metrics from those locations, and analyzing the collected data using "conventional software products."

*Applied Predictive Techs., Inc. v. Marketdial, Inc.*, 2020 U.S. Dist. LEXIS 221981, at *7-*8 (D. Utah Nov. 25, 2020) ("'916 Order").

The '916 patent sought to resolve this issue by reducing human error. The patent recited a process by which retailers decided categories of performance metrics to collect (for example, gross profit margins, changes in average sales, or number of products sold) and business locations from which to collect such data. These decisions are referred to as a test's parameters. *Id*. at *8. "These parameters form the crux of the problem identified by the '916 patent. In particular, the patent notes that the parameters selected for a business initiative test may influence the results of that test, [] skewing the test's findings." *Id*. at *8-9. Thus, the '916 patent identified that "there is a need for a system and method that automatically identifies one or more analytical parameters that filter out the most inconsistent data to maximize a retailer's ability to analyze the results of an initiative test." *Id*. at *9. The '916 patent sought to respond to this need by claiming a process of performing virtual tests on virtual test sites in an attempt to identify parameter settings that would create the least "noise" and thus optimize parameter settings for business initiative testing. Independent claim 1 of the '916 patent laid out this process, explaining the basis of the virtual testing by claiming

[a] method for determining optimal parameter settings for business initiative testing software used for testing initiatives for business locations included in a business network, comprising:

[a]	identifying, by a computer, a business initiative testing model having a set of parameter settings;

[b]	selecting a first parameter setting set for performing the virtual test, the first parameter setting set including a set of selected parameter setting options each respectively corresponding to one of the parameter settings for the business initiative testing model;

[c]	performing, by a computer, a virtual test on a set of virtual test sites, each virtual test site reflecting a selected business location in the business network, wherein each virtual test is a simulated business initiative test performed on test sites where no actual initiative test has been implemented at those test sites, and wherein the virtual test is performed on the virtual test sites using a variation of each parameter setting;

[d]	determining, by a computer, actual performance data associated with the set of virtual test sites;

[e]	determining, by a computer, actual performance data associated with a set of control group sites reflecting second selected business locations in the business network using the tested parameter settings;

[f]	determining a noise value for the first parameter setting set, the noise value reflecting an inconsistency between performance data associated, with the set of virtual test sites and performance data associated with the set of control group sites reflecting second selected business locations in the business network using the tested parameter settings;

[g]	determining, by a computer, a set of optimal parameter settings for the business initiative testing model based on results from the virtual test whereby the optimal parameter settings best minimize noise from the results; and

[h]	configuring, by a computer, the business initiative testing model using the optimal parameter settings to test a business initiative for application in the business network.

'916 patent at 25:60-26:33 (bracketed letters added for organizational ease). In layman's terms,

the process provided for in the '916 patent begins with choosing a business initiative testing model with a selected set of parameters, such as the type of performance data collected, the geographic locations of the stores, or the time of year that the test is performed. Then, rather than merely implementing this test, as a retailer would traditionally do, the patent provides a process for 'testing' parameter settings to determine whether they are the optimal parameter settings for the business initiative testing model.

'916 Order at *11-12.[1] Performance metrics for virtual test sites are compared against the historical performance data of control sites, and discrepancies in results between the two are attributed to "some influence present in the parameter settings options selected. This inconsistency is referred to as 'noise.'" *Id*. at *12.[2]

"The patent then consists of storing this noise value and iteratively 'testing' a large number of parameter setting options in this same way. The noise values for these different tests are also stored and the optimal parameter setting, or the parameter setting that creates the least 'noise,' can be identified." *Id*. at *13. "As can be seen in [c]laim 1," however, "the specifics of this analysis are not provided for in the patent. Rather, the process articulated in the patent appears to consist of any process that permits the patent-user to analyze the data and obtain the relevant performance metrics and, as a result, 'noise.'" *Id*. at *12 n.3.

---

[1] Or, as this court explained elsewhere in its order,

> [the] method consists of selecting a set of parameter settings to test, performing a virtual test on virtual test sites, determining the performance data at those sites, and comparing that data with the performance data from a set of control group sites. This process is performed iteratively, testing a range of parameter settings. Once the testing is complete, the noise values for the different parameter settings are compared and the optimal setting can be identified. The claim concludes with configuring the business initiative testing model using these optimal parameter settings.

'916 Order at *32.

[2] The '916 patent discusses and defines "noise" in the following terms: (1) "Noise may be a quantified measurement of inconsistent performance data for sites used in the analysis performed by the model." '916 patent at 17:37-39. (2) "Noise reflects a quantified measurement of inconsistent performance data for sites used in the analysis performed by a business initiative testing model." *Id*. at 22:26-29. The '916 Order discussed the patent's definition of noise, determining that claim construction was not necessary for the term. *See* '916 Order at *19-*20.

### B. Litigation on the '916 Patent

On June 28, 2018, APT filed suit against MarketDial in the United States District Court for the District of Delaware, asserting, among other things, infringement of the '916 patent. ECF No. 1 ("Compl.") ¶ 17. The action was transferred to this district in July of 2019. MarketDial subsequently moved to dismiss APT's patent claim, arguing that the '916 patent was invalid under 35 U.S.C. § 101 for lack of patent-eligible subject matter. On November 25, 2020, this court granted MarketDial's motion to dismiss APT's patent infringement claim, holding that the '916 patent was invalid under 35 U.S.C. § 101. In doing so, the court treated independent claim 1 as representative of the '916 patent as a whole. '916 Order at *14. This court also concluded that claim construction was not necessary to dispose of APT's claims as a matter of law. *Id.* at *18-19.

Following the two-step test articulated by the Supreme Court in *Alice Corp. Pty. v. CLS Bank International*, 573 U.S. 208 (2014), the court first sought to determine whether the claims at issue were directed to one of those patent-ineligible concepts. '916 Order at *6. The court determined that the '916 patent sought to claim "a process that qualifies as an 'abstract idea' for which computers [or software] are invoked merely as a tool," *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016), namely, the process of optimizing parameters for business initiative testing. '916 Order at *26-27. The court continued:

> Though the specification mentions that technical components, such as the computer system, network, server, and memory, are necessary to execute these tests, it describes these components vaguely and in terms of their basic functions. For example, the specification notes that the server "may be a computer system such as a desktop computer, workstation, or any other similar server side computing system that performs one or more server-side processes." ['916 patent at 6:39-41.] It goes on to describe generic computing system attributes and, later in the specification, provides that a general-purpose computer can be configured to perform the invention. At no point, however, does the specification discuss the technical details of these components or suggest that the functionality of these components will be improved.

*Id*. at *29-30 (citing *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768 (Fed. Cir. 2019)).

Thus, the court concluded that "[t]he components discussed in the specification are merely tools necessary to create a technological environment within which the claimed invention can be implemented." *Id*. at *31. Much like the specification, "the claim provides no further details about these components' functionality. Instead, these technical components are described based on their function in the implementation of the claimed invention." *Id*. at *33.[3] Following the direction of the Federal Circuit, the court determined that the '916 patent, being directed to a functional result and without meaningful restrictions regarding how that result could be accomplished, was overbroad and thus directed toward patent-ineligible subject matter:

> Any data analysis process by which the noise levels associated with parameter settings are discerned falls within the scope of the '916 patent. The concept of 'performing virtual tests on virtual test sites' is a results-oriented one. The patent fails to clearly articulate the process by which that result is obtained and instead purports to encompasses all routes to the result . . . To grant a patent on the concept as it is articulated in the '916 patent would be to preempt any method of analyzing historical data to determine how certain parameter settings influence that data. This concept is not a patentable improvement to computer functionality; it merely preempts data analysis in the context of business initiative tests.

*Id*. at *37-38.[4] Thus, the '916 failed to satisfy *Alice* Step One.

---

[3] Additionally, the court determined that, even if it were to accept APT's characterization of the '916 patent as being directed to "performing virtual tests on virtual test sites," it would nonetheless be directed toward an abstract idea for the purposes of *Alice* Step One. '916 Order at *34-35. "The '916 patent's description of 'performing virtual tests on virtual test sites' is not a specific process involving an identifiable analysis. Rather, the patent broadly describes any analysis that ends in a particular result: parameter setting optimization." *Id*. at *36.

[4] Here, the court relied on *ChargePoint*, 920 F.3d at 770, ("[T]he broad claim language would cover any mechanism for implementing network communication on a charging station, thus preempting the entire industry's ability to use networked charging station."), *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 (Fed. Cir. 2016) ("[W]hen a claim directed to an abstract idea 'contains no restriction on how the result is accomplished . . . [and] [t]he mechanism . . . is not described, although this is stated to be the essential innovation[,]' then the

Moving on to *Alice* Step Two, the court determined that the '916 patent failed to supply an inventive concept so as to transform the nature of the claim into a patent-eligible application. *Id*. at *53. In particular, the court expressly held that neither "performing virtual tests on virtual test sites" nor the claimed invention's ordered steps were an inventive concept, neither did they constitute additional elements of the '916 patent. *Id*. at *54-58. Neither the virtual tests nor the '916 patent's ordered combination, the court concluded, "constitute[d] anything more than the implementation of the abstract concept identified in step one of the *Alice* analysis. Thus, even accepting APT's factual allegations as true, these allegedly inventive concepts are not, as a matter of law, additional features of the '916 patent." *Id*. at *59. The '916 action in this court was terminated on March 28, 2024. On that date, summary judgment was granted on the remainder of APT's claims and judgment was entered in favor of MarketDial.

### C.  Reissue

Patent holders may seek reissue of an existing patent under a limited, statutorily prescribed set of circumstances:

> Whenever any patent is, through error, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Director shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

35 U.S.C. § 251(a).[5]

---

claim is not patent-eligible."), and *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015).

[5] MarketDial contends that the '562 patent was illegitimately reissued. In part, it suggests that patents invalidated under *Alice* are generally ineligible for reissue. The court agrees that it does

In April of 2021, APT filed an application with the PTO to reissue the '916 patent. Compl. ¶ 24. APT's application for reissue included all 35 of the claims that this court previously determined to be invalid,[6] as well as 43 novel claims that "depend upon" and "correspond to" the original 35 claims. *Id*. ¶ 29. According to MarketDial, on April 27, 2021, in conjunction with its application for reissue of the '916 patent, APT filed with the PTO an information disclosure statement containing 104 documents. In that disclosure, APT did not list or make any reference to this court's decision invalidating the '916 patent. *Id*. ¶ 30. On December 13, 2021, APT filed a second information disclosure statement, attaching more documents, this time including this

---

not seem that invalidation on *Alice* grounds meets any criteria for reissue under the statute. In some cases, claiming less than one has a right to claim may conceivably result in failing to supply an inventive concept at *Alice* Step Two (assuming that such an inventive concept lurks in the patent specification). But reissued patents must be for the same invention as set out in the original patent, *Antares Pharma, Inc. v. Medac Pharma Inc.*, 771 F.3d 1354, 1359-60 (Fed. Cir. 2014) (quoting 35 U.S.C. § 64 (1946); *Forum US, Inc. v. Flow Valve, Ltd. Liab. Co.*, 926 F.3d 1346, 1351 (Fed. Cir. 2019); *U. S. Indus. Chems., Inc. v. Carbide & Carbon Chems. Corp.*, 315 U.S. 668, 676 (1942) (interpreting 35 U.S.C. § 64 (1934)) ("[I]t is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification."); *accord Corbin Cabinet Lock Co. v. Eagle Lock Co.*, 150 U.S. 38, 42-43 (1893). The question then becomes whether a reissued patent, which must be the same invention as claimed in the original patent, could ever be directed to new subject matter or provide an inventive concept where none existed before.

Failure to claim an inventive concept seems to transcend beyond the problem of claiming less than one has a right to—rather than a "case of insufficiency, overstating, inadvertence, accident, or mistake of the original patent," invalidation on *Alice* grounds is better characterized as one of "adjudicated invalidity for lack of patentable invention. And adjudged lack of patentability is not made by the statute a ground for reissue." *Penn Elec. & Mfg. Co. v. Conroy*, 185 F. 511, 514 (3d Cir. 1911); *accord B. F. Goodrich Co. v. Am. Lakes Paper Co.*, 23 F. Supp. 682, 685 (D. Del. 1938).

Because the court has determined that the '562 patent itself is ineligible under *Alice*, however, it need not decide the broader doctrinal issue raised by MarketDial. That said, the court is of the view that MarketDial's position may be meritorious, and that this may be a matter in need of further consideration by the Federal Circuit.

[6] APT eventually canceled these first 35 claims, which were carried over verbatim from the '916 patent. Compl. ¶ 35.

court's order invalidating the '916 patent. MarketDial insists, however, that APT failed to properly call the '916 Order to the attention of the PTO. *Id*. ¶ 31. This failure, MarketDial alleges, was driven by deceptive intent. *Id*. ¶ 32.

On May 10, 2022, the patent examiner issued a non-final rejection of all pending claims of the '562 patent on the ground that all claims failed under *Alice*. ECF No. 19-7 at 684-90. That PTO action does not reference this court's '916 Order. *See id*. at 684-706.[7] APT responded by arguing that the revised claims were analogous to one or more patent-eligible hypothetical patent claims contained in a PTO guidance document. *See* ECF No. 20-2.[8] The PTO then reversed course and the '562 patent was issued on June 23, 2023, featuring an identical specification and figures to the '916 patent. Compl. ¶ 24.

Claim 36 of the '562 patent claims the following method:

A method for determining optimal parameter settings for a predictive machine-learning model in business initiative testing software used to filter inconsistent data for testing initiatives for business locations included in a business network, comprising:

[a] identifying, by a computer, a predictive machine-learning business initiative testing model having a set of parameter settings;

[b] selecting, by the computer, a first parameter setting set for performing a virtual test, the first parameter setting set including a set of selected parameter setting options each respectively corresponding to one of the parameter settings for the predictive machine-learning business initiative testing model, wherein at least one parameter setting includes a time period;

---

[7] APT maintains that the prosecution history of the '562 patent reveals that the PTO considered the '916 Order but nonetheless concluded that the revised claims did not suffer from the same defects as the '916 patent. ECF No. 20 ¶ 28.

[8] The examples referenced by APT (that is, examples 39 and 40) are purely hypothetical and are not based on any Federal Circuit precedent or case law. They were promulgated as guidance for the purpose of standardizing patent examiner decisions. They are not binding on this or any other federal court. *In re Rudy*, 956 F.3d 1379, 1382 (Fed. Cir. 2020); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 760 F. App'x 1013, 1020 (Fed. Cir. 2019) (unpublished).

[c]    simulating performance of the first parameter setting set by performing, by the computer, the virtual test on a set of virtual test sites, each virtual test site reflecting a selected business location in the business network, wherein each virtual test is a simulated business initiative test performed on test sites where no actual initiative test has been implemented at those test sites, and wherein the virtual test is iteratively performed on the virtual test sites using a variation of a parameter setting option for each parameter setting;

[d]determining, by the computer, actual performance data associated with the set of virtual test sites;

[e]    determining, by the computer, actual performance data associated with a set of control group sites reflecting second selected business locations in the business network using tested parameter settings;

[f]    determining, by the computer, a noise value for the first parameter setting set, the noise value reflecting an inconsistency between actual performance data associated with the set of virtual test sites and actual performance data associated with the set of control group sites reflecting second selected business locations in the business network using the tested parameter settings;

[g]    determining, by the computer, a set of optimal parameter settings for the predictive machine-learning business initiative testing model based on results from performing the virtual test whereby the optimal parameter settings best minimize the noise value from the results;

[h]    training, by the computer, the predictive machine-learning business initiative testing model by configuring, by the computer, the predictive machine-learning business initiative testing model using the optimal parameter settings based on the noise value for each parameter setting option of each parameter setting of the parameter setting set to test a business initiative for application in the business network; and

[i]    executing, by the computer, the predictive machine-learning model using the set of optimal parameter settings.

'562 patent at 31:43-32:29 (bracketed letters added for organizational ease).

Claim 36 of the '562 patent is similar to claim 1 of the '916 patent, which this court considered as representative of the '916 patent as a whole. For the sake of ease, the court includes

below a side-by-side comparison of claim 1 of the '916 patent (on the left) and claim 36 of the

'562 patent (on the right):[9]

| | |
|---|---|
| A method for determining optimal parameter settings for business initiative testing software used for testing initiatives for business locations included in a business network, comprising: | A method for determining optimal parameter settings for <u>a predictive machine-learning model in</u> business initiative testing software used <u>to filter inconsistent data</u> for testing initiatives for business locations included in a business network, comprising: |
| [a] identifying, by a computer, a business initiative testing model having a set of parameter settings; | [a] identifying, by a computer, <u>a predictive machine-learning</u> business initiative testing model having a set of parameter settings; |
| [b] selecting a first parameter setting set for performing the virtual test, the first parameter setting set including a set of selected parameter setting options each respectively corresponding to one of the parameter settings for the business initiative testing model; | [b] selecting, <u>by the computer</u>, a first parameter setting set for performing [t̶h̶e̶] <u>a</u> virtual test, the first parameter setting set including a set of selected parameter setting options each respectively corresponding to one of the parameter settings for the <u>predictive machine-learning</u> business initiative testing model, <u>wherein at least one parameter setting includes a time period</u>; |
| [c] performing, by a computer, a virtual test on a set of virtual test sites, each virtual test site reflecting a selected business location in the business network, wherein each virtual test is a simulated business initiative test performed on test sites where no actual initiative test has been implemented at those test sites, and wherein the virtual test is performed on the virtual test sites using a variation of each parameter setting; | [c] <u>simulating performance of the first parameter setting set by</u> performing, by [a̶] <u>the</u> computer, [a̶] <u>the</u> virtual test on a set of virtual test sites, each virtual test site reflecting a selected business location in the business network, wherein each virtual test is a simulated business initiative test performed on test sites where no actual initiative test has been implemented at those test sites, and wherein the virtual test is <u>iteratively</u> performed on the virtual test sites using a variation of <u>a parameter setting option</u> for each parameter setting; |

[9] The chart indicates, by use of underlining, language that is unique to claim 36 of the '562 patent that did not appear in claim 1 of the '916 patent (that is, language that can be said to have been *added* through the reissue). Language that appeared in the '916 patent but not the '562 patent (that is, language that can be said to have been *removed* through reissue) is indicated with strikethrough.

| | |
|---|---|
| [d] determining, by a computer, actual performance data associated with the set of virtual test sites; | [d] determining, by [a] the computer, actual performance data associated with the set of virtual test sites; |
| [e] determining, by a computer, actual performance data associated with a set of control group sites reflecting second selected business locations in the business network using the tested parameter settings; | [e] determining, by [a] the computer, actual performance data associated with a set of control group sites reflecting second selected business locations in the business network using [the] tested parameter settings; |
| [f] determining a noise value for the first parameter setting set, the noise value reflecting an inconsistency between performance data associated, with the set of virtual test sites and performance data associated with the set of control group sites reflecting second selected business locations in the business network using the tested parameter settings; | [f] determining, by the computer, a noise value for the first parameter setting set, the noise value reflecting an inconsistency between actual performance data associated with the set of virtual test sites and actual performance data associated with the set of control group sites reflecting second selected business locations in the business network using the tested parameter settings; |
| [g] determining, by a computer, a set of optimal parameter settings for the business initiative testing model based on results from the virtual test whereby the optimal parameter settings best minimize noise from the results; and | [g] determining, by [a] the computer, a set of optimal parameter settings for the predictive machine-learning business initiative testing model based on results from performing the virtual test whereby the optimal parameter settings best minimize the noise value from the results; [and] |
| [h] configuring, by a computer, the business initiative testing model using the optimal parameter settings to test a business initiative for application in the business network. | [h] training, by the computer, the predictive machine-learning business initiative testing model by configuring, by [a] the computer, the predictive machine-learning business initiative testing model using the optimal parameter settings based on the noise value for each parameter setting option of each parameter setting of the parameter setting set to test a business initiative for application in the business network; and |
| | [i] executing, by the computer, the predictive machine-learning model using the set of optimal parameter settings. |

| | |
|---|---|
| '916 patent at 25:60-26:33 (bracketed letters added for organizational ease). | '562 patent at 31:43-32:29 (bracketed letters added for organizational ease). |

### D.  The Instant Action

On July 20, 2023, counsel for APT sent a cease-and-desist letter related to the '562 patent. Compl. ¶ 14. As a result of that letter, MarketDial filed this action. Through it, MarketDial first seeks judgment declaring that the '562 patent is no more patent eligible than the '916 patent. *Id*. ¶ 38. Second, MarketDial seeks judgment declaring that the '562 patent is unenforceable due to inequitable conduct on the part of APT in its prosecution, including its failure to call the '916 Order to the attention of the PTO. *Id*. ¶ 43. On September 20, 2023, APT moved to dismiss MarketDial's complaint. APT also concurrently filed an answer to MarketDial's complaint, in which it asserted a claim for infringement of the '562 patent. ECF No. 20 ("Answer") ¶¶ 56-60.[10]

APT's counterclaim alleges that MarketDial "infringes at least [c]laim 36 of [the] '562 [p]atent based on APT's investigation of the literature that MarketDial makes publicly available as well as an analysis of the problem that MarketDial's [system] purports to solve[.]" *Id*. ¶ 55. APT alleges that MarketDial's system infringes by performing "a method for determining optimal parameter settings for business initiative testing software used for testing initiatives for business locations included in a business network," and by performing "each of the limitations of claim 36 of the '562 [p]atent." *Id*. ¶¶ 58-59. In addition to these allegations of infringement, APT's

---

[10] In its answer, APT also argues that it did, in fact, disclose the '916 Order, which it states is included "as Exhibit 3001 in Cite No. A96 of the CBM Review Decision." Answer ¶ 30.

counterclaim refers to an infringement claim chart for claim 36 attached as an exhibit to its answer. *See* ECF No 20-3.

For purposes of this litigation, the parties agree that claim 36 of the '562 patent is representative of the '562 patent as a whole, and the court thus considers the language of that claim in determining whether the '562 patent is valid and unenforceable under 35 U.S.C. § 101 and the two-step test articulated in *Alice*.

## LEGAL STANDARD

Dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate where the plaintiff fails to state a claim upon which relief can be granted. When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The complaint must allege more than labels or legal conclusion and its factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[W]hether a [patent] claim recites patent eligible subject matter is a question of law which may contain underlying facts," and patent eligibility may be resolved at the motion-to-dismiss stage. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014); *accord Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372 (Fed. Cir. 2020).

## DISCUSSION

35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of" Title 35 of the United States Code. The Supreme Court has long held that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable" under § 101. *Alice*, 573 U.S. at 216 (citing *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). Regarding abstract ideas, the *Alice* Court instructs courts first to "determine whether the claims at issue are directed to a patent-ineligible concept" at Step One. *Id*. at 218. If so, at *Alice* Step Two, a court must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent eligible application." *Id*. at 217 (quotation omitted). "[P]atent eligibility is ultimately a question of law[.]" *Berkheimer*, 881 F.3d at 1369.

## I.    Alice Step One

"The analysis at step one 'must focus on' the claim language." *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023) (quoting *ChargePoint*, 920 F.3d at 769). The Supreme Court "has not established a definitive rule to determine what constitutes an abstract idea" for the purposes of *Alice* Step One, *Enfish*, 822 F.3d at 1334 (quotation omitted), but, in cases involving inventions related to computer innovations, the inquiry may "turn[] on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies an abstract idea for which computers are invoked merely as a tool." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306 (Fed. Cir. 2020) (citing *Customedia Techs., LLC v. DISH Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020)).

Patent claims may be directed to eligible subject matter when they are not merely "implemented on a computer" but "improve[] an existing technological process." *Alice*, 573 U.S. at 223. That is, where patent claims purport to "improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field," they may be directed to eligible subject matter and thus pass muster under Step One. *Id*. at 225 (citing *Diamond v. Diehr*, 450 U.S. 175, 177-78 (1981). Judge Mayer, in his dissent in *DDR*, described this principle as the "technological arts standard." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1265 (Fed. Cir. 2014) (Mayer, J., dissenting).

This technological arts standard questions whether "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of" the computer technology at issue, *id*. at 1257, and relates to the functionality of the technology itself. *See Uniloc*, 957 F.3d at 1309. And, as the majority in *DDR* specifies, patent claims must recite "sufficiently specific and meaningful applications of their underlying abstract ideas" to satisfy this standard. *DDR*, 773 F.3d at 1256; *accord Uniloc*, 957 F.3d at 1308 ("The claims at issue do not merely recite generalized steps to be performed on a computer using conventional computer activity."); *Enfish*, 822 F.3d at 1338-39; *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354 (Fed. Cir. 2014).

Proper Step One characterization demands reference to the plain language of the claims themselves as instructed by the patent specification, but without importing unclaimed matters from

the specification into the analysis.[11] *Hawk Tech*, 60 F.4th at 1356; *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013); *Berkheimer*, 881 F.3d at 1360.

### A.      The '562 Patent Considered

APT contends that the technological arts standard ought to apply in the instant case, arguing that claim 36 of the '562 patent is directed to the improvement of machine-learning technologies. But this argument is belied by the language of the '562 patent itself. Reference to claim 36 reveals that it is not directed to any specific improvement of machine-learning technology or its functioning. Instead, the language of claim 36—even understood in light of the specification—makes clear that it is directed towards optimizing parameter settings for business initiative tests.[12]

---

[11] Of course, courts' characterization of what patent claims are directed to can have profound effects for the *Alice* Step One inquiry. In so doing, courts search for the "heart" or "focus" of the claims, *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir. 2018); *Ultramercial*, 772 F.3d at 714; *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344 (Fed. Cir. 2013); *see also Internet Patents*, 790 F.3d at 1348 ("basic character"), or the "concept embodied by the majority of the limitations." *Ultramercial*, 772 F.3d at 715. At times, courts characterize patent claims very broadly—as if imagining the broadest conceptual process at issue. *E.g.*, *Accenture*, 728 F.3d at 1344-45; *Two-Way Media Ltd v. Comcast Cable Communs., LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015).

Other times, courts are much more generous, characterizing patent claims in more particular and technical terms to pad the Step One inquiry. *E.g.*, *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361-62 (Fed. Cir. 2018). *Alice* itself offered a high-level characterization of what the patent-at-suit was directed to, stating simply that it was drawn to the "idea of intermediated settlement." *Alice*, 573 U.S. at 218.

The court understands the Federal Circuit's recent decision in *Hawk Technology Systems* to provide a prime example of claim characterization at an appropriate level of abstraction—hewing to the actual claim language rather than the solution that the patent holder believes is remedied by the invention but without succumbing to the temptation of oversimplification. *See* 60 F.4th at 1357.

[12] The court notes that this was also what the '916 patent was directed to. *See* '916 Order at *27. Because reissued patents must claim essentially the same invention as the original patent, this outcome may be fairly predictable. *See Antares*, 771 F.3d at 1359-60.

This is "an idea, having no particular concrete or tangible form." *Ultramercial*, 772 F.3d at 715. Although both the preamble and several limitations of claim 36 refer to machine-learning technologies, no part of claim 36 purports to improve the operation of such technologies or claim any particular innovation in machine learning generally. In short, it "says nothing" about any particularities of machine learning, suggesting that improving machine-learning capabilities is not claim 36's "focus." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1289 (Fed. Cir. 2018).

APT does not "purport to have invented" machine-learning capabilities better suited to business initiative analytics,[13] but rather claims the mere application of machine-learning technologies generally to such analytics, primarily through the collection and analysis of data. *BSG*, 899 F.3d at 1286; *Hawk Tech. Sys.*, 60 F.4th at 1358. "[C]laims focused on 'collecting information, analyzing it, and displaying certain results of the collection and analysis' are directed to an abstract idea." *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (quoting *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016)). Like the patent in *BSG*, the '562 patent falls without the technological arts standard. The ultimate problem

---

[13] Indeed, claim 36 offers no instruction on machine-learning processes. Instead, the individual claim elements of claim 36 recite a high-level data-gathering and data analysis process involving selecting parameter sets, simulating performance of the parameter set on a series of virtual test sites and actual business locations, determining the results, determining which parameter settings are associated with the least noise, configuring the model with these parameter settings, and then executing the model on a computer. Specific computational methods are not disclosed, and the claim language recites a general, high-level process unencumbered with details regarding machine-learning processes of any sort.

Additionally, the specification of the '562 patent—like the '916 patent—refers to machine learning techniques (in particular, neural network analysis) only twice and in extremely cursory terms: once as an illustration of how the claimed invention might be used (using modeling technologies "*such as* linear regression, staged linear regression, neural network basic train, neural network stepwise regression, decision tree, K-means similar site modeling, and any other type of software model," '562 patent at 14:10-15 (emphasis added), and a second time in Figure 13 without any elaboration.

to which the '562 patent is directed is, by its own terms, a problem of deficiencies inherent to existing practices in business initiative testing.[14] It is thus analogous to the patent at issue in *BSG*:

> While the presentation of summary comparison usage information to users improves the quality of the information added to the database, an improvement to the information stored by a database is not equivalent to an improvement in the database's functionality. BSG Tech's claimed invention results in better user input, but the database serves in its "ordinary capacity" of storing the resulting information.

*BSG*, 899 F.3d at 1288.

Tracking the analysis of the Federal Circuit in *BSG*, while the optimization of parameter settings in business initiative testing improves the quality of the tests' results, an improvement in testing results is not equivalent to an improvement in the computational or machine-learning processes or capabilities employed during the test. Even if APT's claimed invention results in better test results, the machine-learning processes serve in their ordinary capacity of analyzing and drawing inferences from patterns in data.[15]

The claim limitations do not redirect the focus of the claim and are instead no more than a means of "break[ing] the abstract idea into basic steps" while adding no "meaningful limitations" with a satisfactory "degree of particularity." *Ultramercial*, 772 F.3d at 714-15. The '562 patent is directed to the same subject matter as the '916 patent. The newly added language may limit the

---

[14] In this way, it seeks to provide more optimal parameter settings for business tests to improve the efficacy and dependability of such tests.

[15] It is clear that the '562 patent is not directed to a problem "specifically arising in the realm of" machine learning, but instead the problem of human error and volatility in the selection of parameter settings in business initiative testing. *Cf. DDR*, 773 F.3d at 1257. In this way, the patent at issue here is paradigmatic of claims that fall without the technological arts standard—it "recite[s] the performance of some business practice" rather than "overcom[ing] a problem specifically arising in the realm of" any particular technology. *Id*.

scope of the claimed matter—that is, the claim is now limited to instances where machine learning is employed—but this is not a meaningful limitation that *redirects* the focus of the patent claims to any new matter. Here, as in *Ultramercial*, *OIP*, *BSG*, and *Accenture*, APT's proposed machine-learning limitation, which merely claims a corner of the abstract idea, does not save the '562 patent from being directed to patent-ineligible subject matter. *Id*; *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-63 (Fed. Cir. 2015) ("[T]hat the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract."); *BSG*, 899 F.3d at 1287 ("[A] claim is not patent eligible merely because it applies an abstract idea in a narrow way."); *Accenture*, 728 F.3d at 1345 ("Accenture's attempts to limit the abstract concept to a computer implementation and to a specific industry thus do not provide additional substantive limitations to avoid preempting the abstract idea of system claim."); *accord ART+COM Innovationpool GmbH v. Google Inc.*, 183 F. Supp. 3d 552, 559 (D. Del. 2016) ("Specificity by itself does not bestow eligibility."); *see also BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("We [] defer our consideration of the specific claim limitations' narrowing effect for step two.").[16]

---

[16] Additionally, machine learning is a conventional computing activity, *Recentive Analytics, Inc. v. Fox Corp.*, 2023 U.S. Dist. LEXIS 166196, at *35 (D. Del. Sep. 19, 2023), and consists of the normal operation of a computer—the performance of mathematical and logical calculations. *Bancorp*, 687 F.3d at 1278. Alternatively, it may be conceived of as a "generic environment" of computing. *BSG*, 899 F.3d at 1286.

In any case, even if the court were to accept, *arguendo*, that machine learning is novel or non-routine in this context, "the addition of merely novel or non-routine components to the claimed idea" does not necessarily turn an abstraction—here, optimizing parameter settings for business initiative testing—into something concrete. *Ultramercial*, 772 F.3d at 715; *accord BSG*, 899 F.3d at 1286-87 ("We have consistently held, however, that claims are not saved from abstraction merely because they recite components more specific than a generic computer."). "[A]ny novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis." *Id*. APT does not argue that the addition of machine learning limitations is novel or

## II.   *Alice* Step Two

Having determined that the patent claim is directed towards patent-ineligible subject matter, the court moves on to *Alice* Step Two in search of "something more"—that is, an "inventive concept" that "transform[s]" the claim into a patent-eligible invention. *Alice*, 573 U.S. at 221. At bottom, the court must ask "[w]hat else is there in the claims before [it]?" *Id.* at 217. "To answer that question," the court considers "the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (quotation marks and citations omitted).

Such transformation can be found where the claim limitations "involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014) (quotation omitted). However, "[s]imply appending conventional steps, specified at a high level of generality, [is] not enough to supply an inventive concept." *Alice*, 573 U.S. at 222 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 82, 77, 72 (2012)) (quotation marks omitted). Additionally, "[t]hat some of the [] steps were not previously employed in this art is not enough—standing alone—to confer patent eligibility upon the claims at issue." *Ultramercial*, 772 F.3d at 716.

In *Alice*, the Supreme Court went to great length to emphasize that the introduction of a computer does not alter the analysis where such computers "implement[] a mathematical principle on a physical machine" and are used for ordinary, off-the-shelf purposes. *Alice*, 573 U.S. at 222.

---

unconventional at Step Two, and instead only argues that it is relevant at Step One as redirecting the claim language toward patent-eligible subject matter.

Stating an abstract idea "while adding the words apply it" is not enough for patent eligibility, even if limited to a "particular technological environment." *Id*. at 222-23 (internal quotation marks and citations omitted). "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional featur[e] that provides any practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself." *Alice*, 573 U.S. at 223-24 (quotation marks and citations omitted); *accord BASCOM*, 827 F.3d at 1352.

Thus, where nothing in the claims "requires anything other than off-the-shelf, conventional computer" technologies but can instead be implemented by generic, "already existing" computer technology, no inventive concept is suggested. *Elec. Power Grp.*, 830 F.3d at 1355; *Hawk Tech. Sys.*, 60 F.4th at 1358; *Berkheimer*, 881 F.3d at 1370 (considering, at Step Two, that certain technological components "existed for years" before the patent-at-suit was issued as significant to the inventive concept inquiry). Thus, courts look, for example, to whether patent claims are "tied to any particular novel machine or apparatus," perhaps requiring specific programming, *buySAFE*, 765 F.3d at 1352, or merely a "general purpose computer," *Ultramercial*, 772 F.3d at 716-17, "conventional computer activities," or "routine data-gathering steps." *OIP*, 788 F.3d at 1363. This is true even where the use of a computer makes the performance of tasks "more quick[] or more accurate[]." *OIP*, 788 F.3d at 1363.[17]

---

[17] This principle is further explained by the Federal Circuit in *Bancorp Services, LLC*. There, the court explained that the introduction of generic computers does not supply an inventive concept because computers, at their most basic, merely perform mathematical or logical operations interchangeably with mental processes. *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). Thus, while the introduction of computer can accelerate or economize a process, it is not truly inventive unless the computer is "integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not." *Id*. at 1278. Where computers are used "for [their] most basic function, [that is,] the performance of repetitive calculations," no meaningful limits on the scope of []

**A.  The '562 Patent Considered**

At Step Two, APT does not argue that the addition of a machine-learning limitation constitutes a *per se* inventive concept. Instead, APT first contends that several of the individual claim elements (listed below) provide an inventive concept and were not fully considered by this court in its '916 Order. Second, APT states that, as an ordered combination, claim 36 of the '562 patent provides an inventive concept.

> i)      Individual claim elements

APT identifies five individual elements of claim 36 as supplying an inventive concept, each of which it argues were overlooked in the '916 Order. Those individual elements are as follows:

> (a) determining actual performance data associated with the set of virtual test sites (corresponding with element [d] of claim 36);
> (b) determining a noise value for the first parameter setting (corresponding with element [f] of claim 36);
> (c) determining a set of optimal parameter settings (corresponding with element [g] of claim 36); and
> (d) configuring a business initiative testing model (corresponding with element [h] of claim 36).

ECF No. 30 ("Opp'n Mem.") at 19-22.[18]

---

claims" is imposed. *Id.*; *accord Two-Way Media*, 874 F.3d at 1341 ("We agree with the district court that nothing in these claims requires anything other than conventional computer and network components operating according to their ordinary functions.") (citing *Intellectual Ventures*, 838 F.3d at 1319-21, and *Elec. Power Grp.*, 830 F.3d at 1355-56).

[18] APT also claims as inventive (e) "[t]he inventive technical features" of the '562 patent. Opp'n Mem. at 22. APT seems to argue that the inventive technical feature described here involved "parameter optimization utilizing noise in the virtual testing[.]" *Id.* at 22. However, APT's argument here is less than pellucid—the inventive technical feature is not clearly identified, and APT fails to distinguish the inventive technical feature it wishes to claim from the other individual claim elements. After all, parameter optimization utilizing noise is claimed in other claim elements and in the '916 patent. *E.g.*, '916 Order at *57-*58.

APT's arguments that these individual elements provide an inventive concept is unavailing. First, the '916 Order considered each these claim elements, which were nearly identical in the representative claim of the '916 patent. Claim elements [d], [f], [g], and [h] are virtually identical to those in claim 1 of the '916 patent and claim 36 of the '562 patent, as demonstrated above in the comparative redline.[19] In the '916 Order, the court considered each of the individual claim elements as integral to the performance of virtual tests on virtual test sites, which it concluded did not constitute an additional feature to the abstract concept of optimizing parameter settings for business test initiatives. '916 Order at *54-*56.

Similarly, the court is satisfied that, under the near-identical language of the '562 patent, determining actual performance data associated with the set of virtual test sites, determining a noise value for the first parameter setting, determining a set of optimal parameter settings, and configuring a business initiative testing model are all integral to the broader abstract concept of optimizing parameter settings for business test initiatives. Each of these elements—involving the analysis of data from the virtual test sites (through unspecified analytical processes), analyzing noise to measure inconsistent performance data (through unspecified analytical processes), optimizing parameter settings by determining the most meaningful parameters (that is, observing which parameter settings are associated with the lowest noise values), and configuring the model using the optimal parameter settings—is essential to the operation of the broader abstract idea of parameter optimization. In other words, each individual claim element is nothing more than some

---

[19] Claim element [h] has seen the most alteration. APT, in the '562 iteration of that claim element, includes the limitation of "training, by the computer, the predictive machine-learning business initiative model" and refers to the "noise value for each parameter setting option of each parameter setting of the parameter setting set." However, none of the new language in any of the individual claim elements supplies an inventive concept.

conceptual step inherent in the process of optimizing parameter settings for business initiative testing.[20]

APT has not supplied an inventive concept simply by breaking the broader concept of business test optimization into basic steps (without meaningful limitations or any satisfactory degree of particularity), most of which consist of routine data-gathering activities effectuated by conventional computer activities. *See Ultramercial*, 772 F.3d at 714-15; *OIP*, 788 F.3d at 1363. For this reason, the court sees no reason to question the '916 Order's reasoning or outcome in determining that none of these claim elements—consisting of nothing more than "generic functional language" requiring nothing other than conventional computer components operating according to their ordinary functions—provide an inventive concept. *Hawk Tech. Sys.*, 60 F.4th at 1358; *see, e.g.*, '562 patent at 5:36-37 ("[G]eneral purpose machines may be used with programs written in accordance with teachings of the invention[.]").

Each step, even facilitated by a computer, recites nothing more than an element of the performance of repetitive calculations by a computer employed for its most basic function, interchangeable with more-laborious paper-and-pen calculation. *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1278 (Fed. Cir. 2012); *buySAFE*, 765 F.3d at 1354; *see, e.g.*, '562 patent at 11-12 (explaining that performance of the steps of claim 36's analytical process consists of repetitive mathematical and logical operations). Or, framed in yet another way, each of these claim elements, claiming generic functional results at each step, "does not sufficiently describe how to achieve these results in a non-abstract way." *Two-Way Media Ltd v. Comcast Cable*

---

[20] Alternatively, each individual claim element is nothing more than some conceptual step inherent in the performance of virtual tests on virtual test sites, which this court has determined to be an abstract concept. '916 Order at *34-*38.

*Communs., LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (citing *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258-59 (Fed. Cir. 2016)). And at no point does the patent claim language "specify[] the rules" or particular means to achieve the result-oriented functional claim elements so as to transform the nature of the claim into a patent-eligible application. *Id*. at 1339.[21]

> ii)     Ordered combination

APT also argues that claim 36 of the '562 patent, considered as an ordered combination, supplies an inventive concept. The court disagrees. This court does not see—"nor has [APT] pointed to—anything inventive in the ordered combination of the claim limitations." *Hawk Tech. Sys.*, 60 F.4th at 1359. Much like the patent-at-suit in *Two-Way Media*, the '562 patent's ordering of steps is nothing more than the implementation of the abstract concept itself using conventional technologies to achieve the desired result. 874 F.3d at 1339. And, for the same reasons as the '916 patent, the ordered combination of claim elements in the '562 patent, consisting of similar claim elements with relatively minor additions and alterations, "is merely the implementation of the abstract concept of optimizing parameter settings for business initiative tests through data analysis, mirroring the concept discussed under *Alice* Step One. "Accepting as true the allegation that benefits flow from this ordered combination does not change the court's analysis." '916 Order at *57-*58.[22]

---

[21] Additionally, APT fails to provide meaningful argument as to why any should be considered inventive under precedential authority. Instead, APT cursorily raises each element, states that the '916 Order got it wrong, and moves on.

[22] APT concludes by arguing that, because the claim limitations narrow the reach of the '562 patent's claims, there is no preemption concern that justifies invalidation at *Alice* Step Two. "This argument misunderstands the step two inquiry. While preemption concerns are the basis for the judicial exceptions to patentability, the absence of complete preemption does not demonstrate patent eligibility." *BSG*, 899 F.3d at 1291 (citing *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015), and *Intellectual Ventures*, 838 F.3d at 1321 (ellipses and

*      *      *

In summary, for much the same reason as the '916 patent, the '562 patent is independently invalid under the two-step test articulated by the Supreme Court in *Alice*. Claim 36, which the parties agree is representative of the '562 patent as a whole, is directed to the abstract concept of optimizing business initiative testing. The claim language, read in light of the specification, provides no inventive concept but simply breaks the overarching abstract concept into basic, general steps, each to be performed by a generic computer using conventional data-gathering and data-analysis techniques.[23] This court is satisfied that MarketDial has demonstrated subject-matter ineligibility by clear and convincing evidence, satisfying the standard articulated by the Federal Circuit. *Accenture*, 728 F.3d at 1346.

## III.    APT's Motion to Dismiss MarketDial's Complaint

Separately, APT has moved to dismiss MarketDial's complaint for failure to state a claim upon which relief may be granted. As discussed above, the claims asserted by MarketDial are all defensive in nature—seeking a declaration that the '562 patent is invalid or unenforceable, either substantively or as a matter of equity (under the doctrines of laches, equitable estoppel, and unclean hands). In particular, APT moves to dismiss MarketDial's claims seeking declarations that the '562 patent is unenforceable due to inequitable conduct (MarketDial's second claim) and regarding

---

quotation marks omitted)). "Such narrowing does not supply an inventive concept." *Id*. at 1291; *accord Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1311 (Fed. Cir. 2016).

[23] Additionally, as was the case in resolving the parties' dispute over the '916 patent, there are no issues of fact that preclude dismissal at this juncture because the concepts posed by APT as bearing on the *Alice* Step Two analysis are integral to the implementation of the abstract concept identified at Step One. "Thus, even accepting APT's factual allegations as true, these allegedly inventive concepts are not, as a matter of law, additional features of the ['562] patent." '916 Order at *59.

other equitable defenses (MarketDial's fourth claim). Because this court has already determined, as a matter of law, that the '562 patent is invalid and unenforceable under *Alice*, APT's motion to dismiss MarketDial's claim for declaratory judgment on those grounds is **DENIED AS MOOT**. Having determined that the '562 patent is invalid under *Alice* as a matter of law, it need not reach MarketDial's equitable claims or arguments.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion to Dismiss Defendant's Counterclaim Pursuant to FED. R. CIV. P. 12(b)(6), ECF No. 25, is **GRANTED**, and Defendant's Partial Motion to Dismiss MarketDial, Inc.'s Complaint, ECF No. 19, is **DENIED AS MOOT**.

DATED June 20, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge